UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
LEXINGTON

| | | |
|---|---|---|
| HOME BUILDERS ASSOCIATION OF LEXINGTON, INC., d/b/a BUILDING INDUSTRY ASSOCIATION OF CENTRAL KENTUCKY, | ) ) ) ) ) | Civil No. 5:19-cv-00178-GFVT |
| Plaintiff, | ) ) | |
| V. | ) ) | **MEMORANDUM OPINION** **&** **ORDER** |
| LEXINGTON-FAYETTE URBAN COUNTY PLANNING COMMISSION, *et al.*, | ) ) ) ) | |
| Defendants. | ) | |

*** *** *** ***

This matter is before the Court on Defendant Lexington-Fayette Urban County Planning Commission's Motion to Dismiss [R. 3] and Plaintiff Building Industry Association of Central Kentucky's Motion for Leave to File First Amended Complaint [R. 7]. For the following reasons, the Defendant Planning Commission's Motion to Dismiss is **GRANTED**, and Plaintiff Building Industry Association of Central Kentucky's Motion for Leave to File First Amended Complaint is **DENIED**.

**I**

The Planning Commission is a public body authorized by Kentucky law to prepare a comprehensive plan guiding the development of local property. [KRS § 100.183; R. 3-1 at 1.] In February 2019, the Planning Commission adopted the most recent iteration, the 2018 Comprehensive Plan. [R. 3-1 at 2.] The Building Industry Association of Central Kentucky ("BIA"), a trade association serving the residential and commercial construction industry in

Central Kentucky, takes issue with the 2018 Plan. [R. 7-1 at ¶¶ 1–2.]

In March 2019, BIA initiated this lawsuit in Fayette County Circuit Court, challenging the legality of the Plan. [R. 1.] The original complaint asserted numerous causes of action against Defendants, seeking to invalidate the Plan on the basis that it violated Kentucky and federal law. [R. 1-2 at ¶¶ 1, 82.] Specifically, BIA challenges the legality of the "Placebuilder" element of the Plan, which incorporates "urban planning best practices" into zone change applications, requiring applicants to address a number of criteria. *Id.* at ¶¶ 40–41. The Planning Commission timely removed the action to this Court claiming federal question jurisdiction, and then moved to dismiss the matter under Federal Rule of Civil Procedure 12(b)(1), arguing BIA lacks standing. [R. 1; R. 3.] BIA responded in opposition to that motion to dismiss [R. 5] and, subsequently, filed a motion for leave to file first amended complaint. [R. 7.] Following BIA's motion for leave, the Planning Commission maintains that dismissal is proper as "the proposed Amended Complaint does not cure the standing issues of the original complaint . . . ." [R. 10 at 1.]

**II**

**A**

The Court first turns to BIA's Motion for Leave to File First Amended Complaint. [R. 7.] Amendments to pleadings are governed by Federal Rule of Civil Procedure 15, which provides that even if the party does not seek the amendment within the of-right period, a court may give leave to permit such an amendment and should "freely give leave when justice so requires." Fed. R. Civ. P. 15(a)(2). The United States Supreme Court has read this provision broadly, and the Sixth Circuit has recognized that "where the underlying facts would support, a motion for leave to amend should be granted, except in cases of undue delay, undue prejudice to the opposing party, bad faith, dilatory motive, repeated failure to cure deficiencies by

2

Case: 5:19-cv-00178-GFVT   Doc #: 12   Filed: 05/18/20   Page: 3 of 17 - Page ID#: 1458

amendments previously allowed, or futility." *Duggins v. Steak'n Shake, Inc.*, 195 F.3d 828 (6th Cir. 1999) (citing *Foman v. Davis*, 371 U.S. 178 (1962)).

The Planning Commission opposes BIA's motion for leave to amend, arguing solely that the proposed amendment is futile as, like the original complaint, it cannot withstand a motion to dismiss for lack of standing. [*See* R. 10.] It is true that, generally, a proposed amendment is futile when it will not survive a motion to dismiss. *Miller v. Calhoun Cty.*, 408 F.3d 803, 817 (6th Cir. 2005). As such, a motion for leave is properly denied "if the court concludes that the pleading as amended could not withstand a motion to dismiss." *Martin v. Associated Truck Lines, Inc.*, 801 F.2d 246, 248 (6th Cir. 1986) (citation omitted). So, here, the decision on whether to grant BIA leave to amend begins and ends with a determination of whether the First Amended Complaint would survive a Rule 12(b)(1) motion.

**B**

When a defendant's motion to dismiss raises the question of subject-matter jurisdiction, the plaintiff "bears the burden of proving jurisdiction in order to survive the motion." *Mich. S. R.R. Co. v. Branch & St. Joseph Counties Rail Users Ass'n*, 287 F.3d 568, 573 (6th Cir. 2002). "Specifically, the plaintiff must show that the complaint 'alleges a claim under federal law, and that the claim is substantial.'" *Id.* (quoting *Musson Theatrical, Inc. v. Federal Express Corp.*, 89 F.3d 1244, 1248 (6th Cir. 1996)). A plaintiff may survive the motion "by showing 'any arguable basis in law' for the claims set forth in the complaint." *Id.*

Rule 12(b)(1) motions "come in two varieties: a facial attack or a factual attack." *Gentek Bldg. Prods., Inc., v. Sherwin-Williams Co.*, 491 F.3d 320, 330 (6th Cir. 2007). A facial attack "questions merely the sufficiency of the pleading." *Id.* When a motion raises a facial attack, a court must accept all the "allegations in the complaint as true," and "if those allegations establish

3

federal claims, jurisdiction exists." *Id.* A challenge to a plaintiff's standing is a facial attack. *See Gaylor v. Hamilton Crossing CMBS*, 582 F. App'x. 576, 579 (6th Cir. 2014). Therefore, in assessing whether standing has been established, the Court will accept the allegations of BIA's First Amended Complaint as true. *Gentek Bldg. Prods., Inc.*, 492 F.3d at 330.

"Standing is a 'threshold question in every federal case.'" *Coal Operators & Assocs., Inc. v. Babbitt*, 291 F.3d 912, 915 (6th Cir. 2002) (quoting *Warth v. Seldin*, 422 U.S. 490, 498 (1975)). Article III's "irreducible constitutional minimum" of standing has three elements: (1) "the plaintiff must have suffered an 'injury-in-fact'—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual and imminent, not conjectural and hypothetical"; (2) "there must be a causal connection between the injury and the conduct complained of"; and (3) "it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) (citations omitted). "The party invoking federal jurisdiction bears the burden of establishing these three elements." *Lujan*, 504 U.S. at 561.

1

The Planning Commission asserts that BIA lacks standing both (1) to sue on its own behalf, and (2) to sue via associational standing on its members' behalf. [R. 3-1 at 5; R. 10 at 10.] These assertions are based on the premise that "neither BIA nor its members have suffered or alleged an injury in fact." [R. 3-1 at 5.] BIA disagrees. First, BIA contends that it has standing in its own right in two ways—statutory standing, as provided by state law, and, statutory standing aside, that it "has also demonstrated the kind of 'injury-in-fact' generally required under Article III." [R. 5 at 7, 12.] In the alternative, BIA contends that it has

4

associational standing to sue on behalf of its members, as at least one of its members, Ball Homes, would have standing to sue in its own right. [R. 11 at 4.]

As an initial matter, the Court must address an important aspect of the standing doctrine as a whole. It is well-established law that a "plaintiff must demonstrate standing for each claim he seeks to press." *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 335 (2006). In other words, standing cannot be "dispensed in gross." *Lewis v. Casey*, 518 U.S. 343, 358 n. 6 (1996). Here, such a clarification is important as, like the original complaint, the First Amended Complaint includes multiple causes of action asserted against Defendants. [*See* R. 7-1; R. 1-2.] However, for the most part, the parties' respective filings suggest that, in their view, a finding concerning whether BIA or its members have standing generally will establish whether BIA can demonstrate standing for each of its claims. [*See e.g.*, R. 3-1 at 5; R. 5 at 16.] The parties' briefing does not touch upon, in any detail, whether standing is proper as to each cause of action. This established, the following analysis will detail whether BIA can demonstrate Art. III standing for each of its claims while bearing in mind the parties' respective views on the matter.

In light of this important clarification, the Court notes that BIA has only advanced one federal claim, Count VIII. This claim alleges that the Plan violates BIA and its members' Fourteenth Amendment rights to procedural due process and substantive due process. [R. 7-1 at ¶¶ 94, 95.] The inquiry into whether BIA can establish Art. III standing will begin with this federal claim, which serves as the basis for federal question jurisdiction. *Id.* at ¶ 4.

**2**

First, the Court will address whether BIA has established Art. III standing to sue in its own right as it relates to these Fourteenth Amendment claims. The main thrust of the Planning Commission's motion to dismiss is that BIA has failed to establish injury in fact. [R. 3-1 at 5.]

To prove this element, as noted above, a plaintiff must show "an invasion of a legally protected interest which is 'concrete and particularized,' and 'actual and imminent, not conjectural and hypothetical.'" *Spokeo*, 136 S. Ct. at 1548 (quoting *Lujan,* 504 U.S., at 560).  For an injury to be "particularized," it "must affect the plaintiff in a personal and individual way." *Id.* (citation omitted).  The injury must also be concrete—meaning it must be "real, and not abstract." *Id.* (internal quotations and citations omitted).

Even taking the allegations in support of both BIA's procedural due process and substantive due process claims as true, BIA fails to establish that it has suffered a particularized and concrete injury.  As it relates to both of these claims, BIA's First Amended Complaint contains the following claims of injury to the organization:

> The 2018 Comprehensive Plan harms the BIA because it frustrates the BIA's mission of promoting the availability of affordable, cost-effective home ownership to the citizens of Fayette County and frustrates its efforts to educate its members on the planning and zoning regulatory process in Fayette County. Because the 2018 Comprehensive Plan is unconstitutionally ambiguous and otherwise unlawful, the BIA cannot educate or advise its members on how they may comply with the 2018 Comprehensive Plan when seeking a zone map amendment or otherwise developing their property in Fayette County.

[R. 7-1 at ¶ 10.]  Aside from BIA's indefinite contention that its mission has been frustrated generally, the only specific allegation as to injury to BIA is that its efforts to educate and advise its members have been frustrated.

In support of this allegation, BIA points to the recent difficulties of one of its members, Ball Homes, in obtaining a zone change under the Plan.  [*Id.* at ¶ 19; R. 7-7 at 4.]  BIA represents that the Planning Commission postponed consideration of Ball Homes' application for a zone change, specifically on the grounds that the application did not comply with the terms of the Placebuilder portion of the Plan.  [R. 7-1 at ¶ 19.]  In BIA's view, Ball Homes' difficulties are an example of how BIA's ability to educate and advise has been impaired in the following ways:

> [BIA] is no longer able to provide valuable insight in educating its members as to where different types of land uses should locate, whether a given proposed use is an [sic] agreement with the comprehensive plan thereby increasing the chance the request will be approved, what conditions are likely to be imposed on the project during the zoning process, and what density will be allowed.

[R. 5 at 14.] However, BIA does not describe with any detail how the Plan has impacted its ability to educate or advise in the above ways, as it concerns Ball Homes or any of its other members.

As to Ball Homes specifically, BIA puts forth no allegations concerning its efforts to educate or advise on the recent application. Instead, it broadly asserts that "BIA member Ball Homes' application is a clear example of how the 2018 Comprehensive Plan . . . frustrates [BIA's] efforts to educate its members on the planning and zoning regulatory process in Fayette County." [R. 11 at 6.] But at no point did Ball Homes even attempt to comply with the Placebuilder criteria set forth in the Plan nor, presumably, did BIA attempt to educate or advise Ball Homes on how to comply. [*See* R. 7-2 at 4.] BIA may have legitimate concern that it will no longer be able to adequately educate and advise in the face of the new Plan, but that is not enough. Concern, without any concrete example of how the Plan has affected BIA's ability to educate or advise, is insufficient to establish an injury. *See Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982); *see also Diamond v. Charles*, 476 U.S. 54, 55 (1986) ("[A]bstract concern does not substitute for the concrete injury required by Art. III.").

To establish injury to an association, courts have looked for "concrete and demonstrable injury to the organization's activities . . . ." *Id.*; *see also Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 919 (D.C. Cir. 2015). If BIA demonstrated that it attempted to educate its members on how to effectively address the new Plan criteria and, despite its best efforts and significant allocation of resources, the resulting application(s) had been denied, then an injury as it relates to BIA's ability to educate and advise might be more apparent. *See Mote v. City of Chelsea*, 284 F.

Supp. 3d 863, 887 (E.D. Mich. 2018) (holding that an association suffered an Art. III injury where it demonstrated significant diversion of its resources as a result of defendants' actions). Such a chain of events would also support BIA's theory that the Plan's "requirements are so vague that they imbue the Planning Commission with unfettered discretion." [R. 5 at 16.] That, however, is not the course of action that BIA chose. BIA fails to establish it suffered an injury in fact and thus has no standing to sue in its own right on its Fourteenth Amendment claims.

Lastly, the Court notes that to the extent BIA seeks to bring a preenforcement challenge [*see* R. 7-7 at 2], this avenue is unavailable in the present circumstances. To satisfy the injury in fact requirement with such a challenge, a plaintiff must allege "an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder . . .." *Babbitt v. Farm Workers*, 442 U.S. 289, 298 (1979). Clearly, here, there is no threat of prosecution or similar potential reprisal as to BIA. *See also Am. Civil Liberties Union v. Nat'l Sec. Agency*, 493 F.3d 644, 653 (6th Cir. 2007) ("Notably, the plaintiffs do not allege as injury that they personally, either as individuals or associations, anticipate or fear any form of direct reprisal by the government . . . such as criminal prosecution, deportation, administrative inquiry, civil litigation, or even public exposure.").

### 3

The Court next turns to whether BIA has standing to sue in its own right for the alleged violations of Kentucky law. In all, BIA advances eight separate claims against the Planning Commission, alleging both statutory and constitutional violations of state law. [R. 7-1 at 24–30.]

On these claims, the Court must first address an apparent misunderstanding evidenced in the briefing. As established above, at an "irreducible minimum" Art. III requires the party invoking the court's authority to establish three elements: (1) injury in fact, (2) causation; and (3)

8

redressability. *Lujan*, 504 U.S. at 560. Importantly, the Supreme Court recently recognized that, as to the injury in fact element, "Congress may 'elevat[e] to the status of legally cognizable injuries concrete, *de facto* injuries that were previously inadequate at law.'" *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1549 (2016) (alteration in original) (quoting *Lujan*, 504 U.S. at 578). In light of this principle, BIA attempts to establish "statutory standing" by way of a Kentucky statute, KRS § 100.347. BIA contends that, in this context, "Kentucky's General Assembly is no different" from Congress [R. 5 at 8], and explains at length how it is the type of party the Kentucky legislature intended to extend standing to under KRS § 100.347. [R. 5 at 8–12.] Pursuant to this "legislative grant of standing under KRS § 100.347," BIA asserts that it "need not demonstrate any more to establish standing under Article III." *Id.* at 11–12.

      This is almost certainly not the case. In a suit based on federal question jurisdiction, it is implausible that Art. III standing in a federal court can be established by way of a state statute for all Plaintiff's claims. [*See* R. 7-1 at ¶ 4.] As stated by other courts facing the same contention:

> It is one thing when Congress enacts a statute, the violation of which constitutes "injury" in the Art. III sense. Congress has, in that case, overridden the prudential limitations and provided an injury which confers standing. It is quite another thing to suggest that the states have the same power to waive by statute the prudential, or more problematically, the constitutional limitations on standing in federal court and, by way of a state created right, confer injury in the Art. III sense where none would otherwise exist.

*Mangini v. R.J. Reynolds Tobacco Co.*, 793 F. Supp. 925, 929 (N.D. Cal. 1992); *see also Ross v. AXA Equitable Life Ins. Co.*, 115 F. Supp. 3d 424, 434 (S.D.N.Y. 2015), *aff'd*, 680 F. App'x 41 (2d Cir. 2017). Even if the Court were to find that KRS § 100.347 confers state statutory standing on BIA in this case, such a finding does not foreclose the need to determine whether Art. III standing exists. *See Ross*, 115 F. Supp. 3d. at 434 (citations omitted) ("[W]hether a state law authorizes standing, or whether a plaintiff has standing to bring suit in state court more

generally, is irrelevant to the Article III analysis."). Accordingly, the Court must separately address Art. III standing as it relates BIA's state law claims.

For the most part, as evidenced by the parties' briefing, the present Art. III standing inquiry renders the same result as the inquiry concerning the Fourteenth Amendment claims. As with the Fourteenth Amendment claims, each of the state statutory and constitutional claims advanced by BIA stem from the same actions: the Planning Commission's formulation and adoption of the Plan. While different theories are advanced as to how the Planning Commission's actions were unlawful, the alleged injuries to BIA stemming from these actions are the same. This much is apparent in BIA's First Amended Complaint:

> [T]he 2018 Comprehensive Plan violates Kentucky and local law in a myriad of ways, and exceeds what KRS Chapter 100 permits the Planning Commission to regulate. The Planning Commission's adoption of the 2018 Comprehensive Plan therefore harms the BIA and its members as builders, developers, property owners, and participants in the planning and zoning process in Lexington-Fayette County by illegally burdening their development activities within Fayette County, and by abrogating their right to engage in a valid and legal planning and zoning process.

[R. 7-1 at ¶ 12.] Notably, on these state law claims, BIA fails to include any additional allegations as it relates to how their ability to educate and advise has been impacted. Therefore, the Court finds that the injury in fact analysis concerning the Fourteenth Amendment claims, *see supra* Section III.B, is equally applicable on the present claims. In short then, given that BIA failed to establish injury in fact on the Fourteenth Amendment claims, BIA similarly fails to establish injury in fact on its state law claims. Accordingly, the Court holds that BIA does not have standing to sue in its own right on either the federal or state law claims.

### 4

#### a

The Court will next address whether BIA has established Art. III standing to sue via associational standing as it relates to its Fourteenth Amendment claims. *See Int'l Union v. Brock*,

10

477 U.S. 274, 281 (1986) ("Even in the absence of injury to itself, an association may have standing solely as the representative of its members"). To establish associational standing, BIA must show that: (1) one of its members would have standing to sue in its own right; (2) the relief it seeks is germane to its purpose; and (3) none of its members need to participate in their individual capacity. *Hunt v. Washington State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977).

As to the first element, like any Art. III standing inquiry, an association must show one of its members "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016). For the below reasons, the Court finds that BIA has failed to establish that one of its members suffered an injury in fact and, therefore, that it lacks associational standing on its Fourteenth Amendment claims.

b

In June 2019, Ball Homes, filed an application for a zone map amendment request with the Planning Commission. [R. 7-1 at ¶ 18; R. 7-2.] After review of the application, the Planning Commission recommended postponing further consideration of the application, stating:

> [T]he applicant would be best served to review The Placbuilder [sic] to address those policies in the most efficient and judicious manner. There are numerous objectives and policies of the 2018 Comprehensive Plan, which have been overlooked. Until the applicant addresses the adopted Comprehensive Plan in a complete manner the staff cannot offer a substantive recommendation.

[R. 7-3 at 8.] Indeed, Ball Homes' application explicitly noted that it did not address the Placebuilder criteria, as in its view, inclusion of the Placebuilder in the Comprehensive Plan was "legally invalid and unconstitutional." [R. 7-2 at 4.] Following the initial postponement, the Planning Commission postponed consideration of the application two additional times, again on the grounds that the application was not in compliance with the Plan. [R. 7-1 at ¶ 20.]

Eventually, in October 2019, the Planning Commission ultimately recommended approval of the Ball Homes application on alternate statutory grounds, as Ball Homes continued to not address the Placebuilder criteria. *Id.* at ¶¶ 23–24.

BIA contends that, in the intervening 143 days between Ball Homes filing its initial application and the ultimate approval of its revised application, Ball Homes sustained a cognizable Art. III injury in two ways. *Id.* at ¶ 24. First, it contends Ball Homes incurred additional costs and expenses resulting from the delay. [R. 11 at 4.] Second, it contends separately that Ball Homes was "also damaged by the Planning Commission's determination that it could not avail itself to the primary provision of KRS [§] 100.213 that planning commissions are directed to evaluate unless it complied with the unlawful Placebuilder program." *Id.*

i

The harm from the delay itself is insufficient to establish injury in fact to Ball Homes. As noted, Ball Homes' initial application made clear that it had no intention of addressing the various criteria set out in the new Plan. [*See* R. 7-2 at 4.] As to the specific criteria applicants were to address, it stated: "[T]he 2018 Comprehensive Plan requires far more of applicants than KRS 100.203 and 100.213 authorizes it to. As such, this Applicant refuses to partake in this clear violation of Kentucky law." *Id.* at 4. Instead of attempting to address the Plan criteria, Ball Homes simply addressed broadly why the proposed zone change and ensuing development would meet the goals and objectives of the Plan. *See id.* at 2.

On the record then, any delay resulting from the Planning Commission request for an application addressing the Plan's criteria was effectively caused by Ball Homes' conscious decision to not address the Placebuilder criteria and, arguably, Ball Homes likely foresaw the ensuing delay. Ball Homes may have otherwise avoided delay if it attempted to address the

12

criteria, but it failed to do so. Instead, due to its displeasure with the criteria, it refused to address them, which foreseeably led to the Planning Commission asking for additional information.

Moreover, Ball Homes acquiesced to the delays stemming from the Planning Commission's requests for additional information. [R. 7-1 at ¶ 20.] The applicable statutory provision, KRS § 100.211(2)(c), provides that ordinarily the Planning Commission is to make its recommendation within 60 days of receiving a zone change application. If the Planning Commission fails to act within the required 60-day period, then an applicant may either waive that requirement, allowing the Commission more time to consider the application, or allow the application to be forwarded from the Commission to the legislative body without a recommendation of approval or disapproval. KRS § 100.211(2)(c)(2)–(3). Here, the Planning Commission asked to postpone consideration of the application in order that Ball Homes could provide additional information. [R. 7-3 at 8.] Ball Homes agreed and submitted a revised application. [R. 7-1 at ¶ 21; R. 7-4.] To the extent that Ball Homes asks the Court to find that it was "coerced" into doing so [R. 11 at 4], the record does not support such a contention.

The self-inflicted nature of the delay, and any attendant monetary loss, becomes even more apparent in view of the ultimate approval of the application. In the end, the Planning Commission approved the Ball Homes' application on alternate grounds, without having to address the Placebuilder criteria. [R. 7-1 at ¶ 24.] This alternate ground—demonstrating that the existing zoning classification was inappropriate—was also not adequately addressed in Ball Homes' initial application, as noted in initial Planning Commission report that recommended postponement. [R. 7-3 at 8.] Ball Homes' revised application addressed this ground in a much more thorough and complete manner. [*Compare* R. 7-4 at 5–6, *with* R. 7-2 at 5.] The Planning Commission then ultimately recommended approval of the zone change on this alternate ground.

[R. 7-6 at 5.] Had Ball Homes simply submitted an initial application that adequately addressed this ground—a recognized avenue to seek a zone change—then it appears likely that no delay would have occurred or, at the very least, that the delay would have been much shorter in duration.

The 143-day delay resulted from Ball Homes' refusal to even attempt compliance with the Plan and, further, its failure to adequately address other alternate grounds for seeking a zone change. The ensuing self-inflicted costs and expenses are insufficient to establish injury in fact. *See Buchholz v. Meyer Njus Tanick, PA*, 946 F.3d 855, 866 (6th Cir. 2020) (citation omitted).

**ii**

The Court now turns to the second theory put forth by BIA, that Ball Homes suffered an injury based on its inability to utilize the most frequently used statutory ground for obtaining a zoning amendment. This amorphous contention is also insufficient to establish injury in fact.

As noted above, there are numerous grounds on which an applicant can seek a zone change. BIA argues, however, that the most frequently used statutory ground is a finding by the Planning Commission that the amendment is in agreement with the applicable Comprehensive Plan. [R. 11 at 7.] Put otherwise, "[w]hile there are alternative ways in which a zone change may be granted, compliance with a comprehensive plan is the threshold question." *Id.* at 5. BIA argues that this avenue has been effectively foreclosed due to the unlawful and onerous nature of the Placebuilder criteria within the 2018 Comprehensive Plan. *Id.* at 7.

First, the Court notes that as Ball Homes did not even attempt to comply with the Plan criteria, it is unclear if it this preferred statutory ground has in fact been foreclosed. So, any apparent injury is speculative in nature. Further, in the case of this specific zone change application there were, at the very least, two well-established avenues for Ball Homes to seek a

zoning change: (1) demonstrating compliance with the Plan requirements, including the Placebuilder criteria; or (2) demonstrating that the existing zoning classification was inappropriate. While demonstrating compliance with Plan requirements is the first avenue the Planning Commission looks to, *see* KRS § 100.213(1), it is uncontested that both avenues were available to Ball Homes from the start. Indeed, following the delays, the Planning Commission eventually recommended approval of the zone change on the second ground. [R. 7-6 at 5.] Ball Homes may be displeased that, in its view, the Plan makes it more difficult to obtain a zone change through its preferred method. But such a qualm does not establish a concrete injury in fact to Ball Homes where another avenue was readily available and, importantly, where Ball Homes never legitimately attempted to pursue a zone change via its preferred method.

Second, BIA's closely related contention that Ball Homes' inability to utilize the most frequently used statutory ground resulted in deprivation "of its right to engage in a valid and legal planning and zoning process" is similarly unavailing. [R. 11 at 5.] Ball Homes did in fact engage in the zoning process and realized its ultimate goal of obtaining a zone change. The Court is unaware of a private party's right to engage in the zoning process to its exact liking. At the risk of being redundant, had Ball Homes or another BIA member sought to obtain a zone change by attempting to be "in agreement" with the Plan and were then rejected, injury in fact might very well be established. That, however, did not happen. BIA fails to establish that Ball Homes has suffered an injury in fact as it relates to BIA's Fourteenth Amendment claims.

### 5

Finally, the Court turns to whether BIA is able to establish associational standing on its state law claims. The Art. III standing inquiry concerning whether associational standing has been established on the Fourteenth Amendment claims applies equally to the state law claims, as

was the case concerning whether BIA had standing to sue in its own right. *See* discussion *supra* Section III.C. The alleged injuries underlying the claims are the same and stem from the same actions of the Planning Commission. Thus, given that BIA failed to establish an injury in fact to Ball Homes on the Fourteenth Amendment claims, BIA also fails to establish an injury in fact to Ball Homes on the state law claims. Accordingly, the Court holds that BIA has failed to demonstrate associational standing as to either the federal or state law claims.

### III

The Supreme Court has "always insisted on strict compliance with th[e] jurisdictional standing requirement," *Raines v. Byrd*, 521 U.S. 811, 819 (1997), and so must this Court. Here, BIA's First Amended Complaint and attendant briefing fail to establish that the alleged legal deficiencies of the 2018 Comprehensive Plan have resulted in an Art. III injury in fact either to it or its member, Ball Homes. The proposed amendment is therefore futile as it cannot withstand the Planning Commission's motion to dismiss for lack of standing. Accordingly, and the Court being sufficiently advised, it is hereby **ORDERED** as follows:

    1.      Defendant's Motion to Dismiss **[R. 3]** is **GRANTED**;

    2.      Plaintiff's Motion for Leave to File First Amended Complaint [**R. 7**] is **DENIED**;

    3.      Plaintiff's original and amended complaints [**R. 1-2 at 1–28; R. 7-1**] are **DISMISSED WITH PREJUDICE**; and

    4.      This case is **STRICKEN** from the Court's active docket.

This the 18th day of May, 2020.

Gregory F. Van Tatenhove
United States District Judge